# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Dunkin' Donuts Franchising LLC, a Delaware limited liability company, and DD IP Holder LLC, a Delaware limited liability company,<br>       Plaintiffs,<br><br>v.<br><br>Minda's Donuts, Inc. a New Hampshire corporation, and Aminda R. Daviduk,<br>       Defendants. | CIVIL ACTION NO.:<br>1:23-cv-00087 |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs Dunkin' Donuts Franchising LLC ("Dunkin' Franchising") and DD IP Holder LLC ("DD IP") (collectively, "Plaintiffs" or "Dunkin'"), by and through undersigned counsel, for their Complaint against Defendants Minda's Donuts, Inc. ("Minda's") and Aminda R. Daviduk ("Daviduk") (collectively, "Defendants"), allege as follows:

## Nature of the Action

1. Dunkin' Franchising is the franchisor of the well-known Dunkin' franchise system. DD IP is the owner and registrant of the Dunkin' trademarks that are used in, and licensed to, the Dunkin' system. Plaintiffs bring this Complaint to stop Minda's and its owner from (i) continuing to operate two former Dunkin' franchised restaurants owned and operated by Minda's as if it were still an authorized franchisee at those locations; (ii) misappropriating and infringing on the Dunkin' trademarks, trade dress, and business operations system; (iii) unfairly competing; and (iv) violating non-compete and other contractual obligations after termination.

## The Parties

2. Plaintiff Dunkin' Franchising is a Delaware limited liability company with its principal place of business in Atlanta, Georgia. The sole member of Dunkin' Franchising is DB

Franchising Holding Company, LLC, whose sole member is DB Master Finance, LLC, whose sole member is DB Master Finance Parent, LLC, whose sole member is Baskin-Robbins International LLC, whose sole member is Baskin-Robbins Flavors, LLC, whose sole member is Baskin-Robbins USA, LLC, whose sole member is Baskin-Robbins, LLC, whose sole member is Mister Donut of America, LLC, whose sole member is Dunkin' Donuts USA, LLC, whose sole member is Dunkin' Donuts, LLC, whose sole member is Dunkin' Brands, Inc. Dunkin' Brands, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.

3. Dunkin' Franchising is engaged in the business of franchising independent businesspeople and entities to operate Dunkin' restaurants throughout the United States subject to the terms of written franchise agreements. Dunkin' Franchising's franchisees are licensed to use the tradenames, service marks, and trademarks of DD IP and to operate under the Dunkin' system, which involves the production, merchandising, and sale of doughnuts, pastries, coffee, and related products utilizing specially designed buildings with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, standards, specifications, proprietary marks, and identification (the "Dunkin' System").

4. Plaintiff DD IP is a Delaware limited liability company, whose sole member is DB Master Finance LLC, a Delaware limited liability company, whose ownership is provided above. DD IP is the owner of the trademark, service mark, and tradename "Dunkin'" and related marks.

5. Upon information and belief, Defendant Minda's is a New Hampshire corporation with its principal place of business in East Hampstead, New Hampshire.

6. Upon information and belief, Defendant Daviduk is a citizen and resident of New Hampshire.

## Jurisdiction and Venue

7. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 1116(a) and 1121, and 28 U.S.C. §§ 1331, 1332, 1338 and 1367. In addition, no Plaintiff shares the citizenship of any Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## General Allegations

### The Dunkin' System and Marks

9. Dunkin' Franchising is the franchisor of the Dunkin' System for franchised restaurants operating under the Dunkin' brands in the U.S.

10. DD IP owns numerous federal registrations for the marks "Dunkin'," "Dunkin' Donuts" and related marks (the "Dunkin Marks"). Among those are U.S. Registration Nos. 6853123, 6847866, 6832127, 6615187, 5904769, 5717806, 6034266, 6119394, 4600316, 4591959, 4290078, 2748147, 2751009, 2465531, 1148165, 976136, 6037957, 6037953, 888360, 907303, 748901, and 715860. Each of these registrations is in full force and effect and is incontestable pursuant to 15 U.S.C. § 1065.

11. DD IP has granted to Dunkin' Franchising the license to use and license others to use the Dunkin' Marks and, along with its predecessors, has used them continuously since approximately 1960 to identify its restaurants and the doughnuts, pastries, coffee, and other products associated with those restaurants.

12. The Dunkin' Marks and related tradenames have been widely and continuously used in interstate commerce for decades in connection with restaurants and the doughnuts, pastries, coffee, and other products associated with these restaurants. The Dunkin' Marks and tradenames are inherently distinctive. Additionally, they have been extensively used, promoted, and advertised, and thus are distinctive and famous indicators of Dunkin' Franchising and its licensed franchises as sources of high-quality goods and services, generating valuable goodwill for Dunkin'.

13. The Dunkin' Marks have been widely advertised and promoted over the years. Between 1971 and 2019, over $5 billion has been spent on advertising and promoting the Dunkin' Marks. Dunkin' spent approximately $470 million in 2019 alone on advertising and promotion.

14. Dunkin' franchisees currently operate over 9,000 Dunkin' restaurants in the United States and over 3,000 restaurants internationally. Dunkin' restaurants feature the distinctive Dunkin' trade dress, including the pink and orange color scheme, and the frankfurter lettering style. In the more than sixty years since the Dunkin' franchise system began, hundreds of millions of consumers have been served in Dunkin' restaurants.

15. Key to that success is the consistent delivery by Dunkin' restaurants of high-quality goods and services. As a restaurant system, a foundation of that quality and consistency is sanitation and food safety.

16. A primary reason that customers choose a familiar brand, such as a franchised restaurant, is that they associate it with consistent quality and product offerings, so that their experience is similar or identical when visiting any location, whether in Boston, Massachusetts or Phoenix, Arizona.

17. To adequately protect their rights and ensure this uniform quality, franchisors exert "a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation." 16 C.F.R. 436.1(h)(2). "Brand standards" is the term commonly used for this control and assistance. In other words, "brand standards" are the standards set by the franchisor that a franchisee must meet when operating under the franchisor's brand.

18. As a result of the extensive sales, advertising, and promotion of items identified with the Dunkin' brand, the public has come to know and recognize the brand and the Dunkin' Marks, and to associate them exclusively with products and services offered by Dunkin' Franchising's franchises. The brand is famous. The Dunkin' Marks are among the best and most widely known in the United States today and are assets of inestimable value to Dunkin', representing and embodying Dunkin's considerable goodwill and favorable reputation.

19. The goodwill and reputation associated with the Dunkin' brand are harmed or subject to being harmed when a franchisee operates a franchised business contrary to the standards and requirements established by the franchise agreement.

**The Franchise Agreements**

20. On or about November 7, 2017, Dunkin' Franchising entered into a franchise agreement (the "Colby Franchise Agreement") with Minda's for the operation of a Dunkin' restaurant located at 6 Colby Corner, Colby Corner Shopping Center, East Hampstead, New Hampshire 03826 (the "Colby Restaurant"), operating under the Dunkin' System and using the Dunkin' Marks, subject to the terms of that agreement. A complete and authentic copy of the Colby Franchise Agreement is attached hereto as **Exhibit "A."**

21. On or about December 4, 2017, Dunkin' Franchising entered into a franchise agreement (the "Sandown Franchise Agreement") with Minda's for the operation of a Dunkin' restaurant located at 304 Sandown Road, Unit 2, Route 121A, East Hampstead, New Hampshire 03826 (the "Sandown Restaurant"), operating under the Dunkin' System and using the Dunkin' Marks, subject to the terms of that agreement. A complete and authentic copy of the Sandown Franchise Agreement is attached hereto as **Exhibit "B."** (The Colby Franchise Agreement and the Sandown Franchise Agreement are collectively referred to herein as the "Franchise Agreements", and the Colby Restaurant and the Sandown Restaurant are collectively referred to herein as the "Restaurants".)

22. At the same time as Minda's entered into the Franchise Agreements, Daviduk executed a Personal Guarantee with respect to each of the Franchise Agreements, agreeing to be personally bound by all of the obligations of Minda's under the Franchise Agreements. True and accurate copies of the Personal Guarantee for the Sandown Franchise Agreement and the Personal Guarantee for the Colby Franchise Agreement are included with the copies of those franchise agreements that are attached as Exhibits A and B hereto.

23. The core of the Franchise Agreements is a limited license granted to Minda's to use the Dunkin' System and the Dunkin' Marks to operate the Restaurants selling proprietary and non-proprietary food and beverage products, including doughnuts, pastries, coffee, ice cream, and other products associated with Dunkin' restaurants, subject to the terms of the Franchise Agreements.

24. In exchange for those rights, Minda's agreed to pay certain fees and, more relevant here, comply with Dunkin' Franchising's brand standards (the "Brand Standards") in the operation of the Restaurants. Ex. A § 2.2.

**Termination of the Sandown Franchise Agreement**

25. On or about September 12, 2022, the landlord of the Sandown Restaurant served Defendants with a notice of termination of the lease between Minda's and the landlord of the Sandown Restaurant, effective immediately, based on repeated breaches by Minda's of the operating hours requirements under the lease. A copy of the notice of termination was sent to Dunkin' Franchising.

26. As a result of the termination of the lease for the Sandown Restaurant, on or about September 27, 2022 Dunkin Franchising served a notice of termination of the Sandown Franchise Agreement on Minda's, notifying Minda's that the franchise agreement was being terminated, effective immediately, as expressly permitted under the Sandown Franchise Agreement. The notice of termination demanded that Minda's comply with all of its post-termination obligations under the Sandown Franchise Agreement, including de-identification of the premises. A true and accurate copy of Dunkin' Franchising's September 27, 2022 notice of termination is attached hereto as **Exhibit "C**."

**Termination of the Colby Franchise Agreement**

27. On October 12, 2022, as permitted by Section 7.2 of the Colby Franchise Agreement, Dunkin' Franchising conducted a routine inspection, known as a Food Safety Review, of the Colby Restaurant ("October 12 FSR") to monitor Minda's compliance with Brand Standards.

28. The October 12 FSR uncovered numerous violations of the Brand Standards at the Colby Restaurant, including multiple health and safety violations that necessitated correction, resulting in a failing score of 48 out of a possible 100 points.

29. Among other things, the October 12 FSR found that sanitizer was not being maintained at proper concentration levels in sinks, buckets and cups; mold was growing in the ice machine used to dispense ice into customers' cups; equipment, food prep tables, utensils and smallwares were dirty; employees were not washing their hands; and recordkeeping practices for monitoring food holding and cooking temperatures were not being followed.

30. On November 3, 2022, based on the October 12 FSR, Dunkin' Franchising sent Minda's a notice of default and impending termination pursuant to Section 14 of the Colby Franchise Agreement. A complete and authentic copy of the November 3, 2022 notice of default is attached hereto as **Exhibit "D."**

31. In the notice of default, Dunkin' Franchising identified numerous violations of the Brand Standards, each one of which constituted a separate breach and default under the Colby Franchise Agreement, and attached the written report of the October 12 FSR.

32. The notice of default also warned Minda's "to take all actions necessary to cure all the defaults . . . within thirty (30) days from the delivery of this Notice."

33. The notice of default further notified Minda's of Dunkin' Franchising's intent to re-inspect the Colby Restaurant after 30 days and take action to enforce its rights, including immediate termination of the Colby Franchise Agreement, if the violations were not cured.

34. Minda's did not respond to the notice of default and did not dispute the October 12 FSR findings or explain anything it was doing to attempt to cure the defaults.

35. Once the 30 days had passed from sending the notice of default, Dunkin' Franchising conducted the promised Food Safety Review re-inspection of the Colby Restaurant on December 8, 2022 (the "December 8 FSR").

36. Yet again, Minda's failed, receiving a score of 58 out of 98.

37. The December 8 FSR found that many of the Brand Standards violations identified during the October 12 FSR had not been cured, including failing to maintain sanitizer at proper concentration levels, failing to keep the front and back of the house clean and maintained, and failing to keep equipment and food prep tables clean and sanitized.

38. Due to Minda's failure to cure the defaults identified in the notice of default, on December 20, 2022, Dunkin' Franchising sent Minda's a notice of termination of the Colby Franchise Agreement. A complete and authentic copy of the December 20, 2022 notice of termination, which included a copy of the December 8 FSR, is attached hereto as **Exhibit "E"**.

39. In the notice of termination, Dunkin' Franchising notified Minda's that, effective immediately, the Colby Franchise Agreement was terminated due to Minda's failure to cure the Brand Standards violations identified in the November 3, 2022 notice of default.

40. Dunkin' Franchising also demanded that Minda's "comply with all [of its] post-term obligations under the Franchise Agreement, including, but not limited to" payment of all monies owed, de-identification of the Colby Restaurant pursuant to a specific checklist provided, and "immediate cessation of all operations."

**Minda's Post-Termination Trademark Violations and Breaches of Contract**

41. Notwithstanding termination of the Franchise Agreements, and without authorization, Defendants continue to operate the Restaurants as Dunkin' restaurants and to hold those locations out as if Minda's were still an approved franchisee for those locations and as if the Franchise Agreements were still in place.

42. Despite the termination of the Franchise Agreements, Defendants continue to use Dunkin's trademarks and other intellectual property and goodwill without authorization to operate the Restaurants.

43. Defendants have continued to display the Dunkin' Marks at the Restaurants and operate them purportedly utilizing the Dunkin' System, holding Minda's out to the public as an authorized Dunkin' franchisee in order to trade on Dunkin's intellectual property and goodwill.

44. To date, Defendants have not complied with any of their post-termination obligations under the Franchise Agreements and the Personal Guarantees. They have not ceased operations of the Restaurants, have not de-identified the Restaurants, and continue to represent Minda's to the public as a Dunkin' franchisee at those locations. Defendants continue to use the Dunkin' Marks, and Dunkin's trade secrets, confidential information, and manuals. And Defendants have not returned any of Dunkin' Franchising's operating manuals, plans, specification, and other proprietary materials relating to the Dunkin' System.

45. Because Minda's is no longer a Dunkin' franchisee, Dunkin' has no ability to control the use of the Dunkin' Marks or trade dress at the Restaurants, inspect them to ensure compliance with Brand Standards, or otherwise protect the goodwill associated with the Dunkin' brand.

46. As a result of Defendants' misconduct, customers will very likely be confused into believing that Minda's remains an authorized Dunkin' franchisee and that the Restaurants are affiliated with Dunkin', deceiving customers as to the origin, sponsorship, or approval of Minda's and/or the Restaurants by Dunkin', when there is none.

47. Therefore, any food safety or customer service problems at the Restaurants will be blamed on Dunkin' and hurt its goodwill with customers.

48. In addition, since Minda's is no longer authorized to purchase food products and ingredients from Dunkin's authorized food suppliers, including proprietary products such as Dunkin'® coffee beans, pre-made ready-bake Dunkin'® donuts, for at least one of the Restaurants,

Minda's may use other substitutes, causing customers to be deceived into thinking they are purchasing Dunkin' branded food products when in fact they are not, and making it impossible for Dunkin' to trace the origin of those products in case health or safety issues arise from their consumption.

49. Accordingly, unless enjoined by the Court, Defendants will continue their misuse of and infringe the Dunkin' Marks, trade dress and the Dunkin' System and unfairly compete with Dunkin', to Dunkin's irreparable injury and in breach of Defendants' contractual obligations.

50. Money damages are an inadequate remedy for Defendants' use of the Dunkin' Marks and trade dress, misuse of Dunkin's confidential information, and failure to comply with the post-termination obligations under the Franchise Agreements.

51. Absent preliminary and permanent injunctive relief, Dunkin', and the entire Dunkin' franchise network, will suffer irreparable harm to their goodwill and reputation.

52. The balance of equities tips decidedly in Dunkin's favor.

53. The public interests in enforcing contracts and protecting the integrity of intellectual property also favor issuance of an injunction.

54. Granting preliminary injunctive relief will ensure that any judgment that Dunkin' may be entitled to will not be rendered ineffectual without such provisional relief.

## Causes of Action

### First Claim for Relief
### Trademark Infringement and Unfair Competition – 15 U.S.C. § 1114

55. DD IP repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

56. DD IP is the owner and listed registrant of the Dunkin' Marks.

57. Minda's is no longer authorized to use the Dunkin' Marks at the Restaurants. Any authorization provided by DD IP and/or Dunkin' Franchising to Minda's was expressly revoked upon termination of the Franchise Agreements.

58. Following termination of the Franchise Agreements, Defendants have used and displayed and continue to use and display the Dunkin' Marks at the Restaurants.

59. Defendants are infringing DD IP's rights by giving customers and potential customers the false impression that Minda's is an authorized franchisee and/or is affiliated with, sponsored by, or associated with the Dunkin' Marks. It does so by operating doughnut restaurants at the same locations, catering to the same customers, and providing the same products and services, all under the Dunkin' Marks.

60. Defendants' misconduct is likely to cause confusion, mistake, or deception amongst customers of Dunkin' franchises, customers of doughnut and coffee restaurant generally, and the general public, as to there being some connection, authorization, or relationship that exists between Minda's and the Dunkin' Marks, in violation of 15 U.S.C. § 1114(1).

61. Defendants' actions, as set forth above, are causing irreparable injury to DD IP, through diversion of its goodwill under the Dunkin' Marks to Minda's, and by diminishing and destroying DD IP's goodwill and reputation, for which there is no adequate remedy at law.

62. Unless they are enjoined by this Court, Defendants will continue to cause a likelihood of confusion and deception to the general public and customers of Dunkin's franchisees and irreparable injury to DD IP.

63. This threat of future injury to DD IP's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of the Dunkin' Marks and to ameliorate and mitigate DD IP's injuries.

64. On information and belief, Defendants have derived unlawful gains and profits from their infringement of the Dunkin' Marks.

65. Defendants' actions, as set forth above, constitute willful trademark infringement, which entitles DD IP to enhanced damages and remedies set forth in 15 U.S.C. § 1117 and 1118.

66. DD IP is also entitled to recover its reasonable attorneys' fees and costs under 15 U.S.C. § 1117.

## Second Claim for Relief
## False Designation of Origin and Unfair Competition – 15 U.S.C. § 1125

67. Dunkin' repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

68. Dunkin' has trademark and trade dress interests in the combinations of elements that make up the authorized Dunkin' system, including but not limited to the Dunkin' Marks.

69. Only authorized franchisees who are required to maintain a specific look and feel that is consistent with the Dunkin' brands and mission are permitted to use the Dunkin' Marks.

70. Minda's is no longer authorized to use the Dunkin' Marks. Any authorization provided by Dunkin' to Minda's was expressly revoked upon termination of the Franchise Agreements.

71. After termination of the Franchise Agreements, Defendants have used and/or displayed, and continue to use and/or display, the Dunkin' Marks at the Restaurants.

72. Defendants are infringing Dunkin's rights by giving customers and potential customers the false impression that Minda's is an authorized franchisee and/or is affiliated with, sponsored by, or associated with the Dunkin' Marks. It does so by operating doughnut restaurants

at the same locations as its former authorized franchised restaurants, catering to the same customers and providing the same products and services, all under the Dunkin' Marks.

73. Defendants' misconduct is likely to cause confusion, mistake, or deception amongst customers of the Dunkin' franchisees, customers of doughnut and coffee restaurants generally, and the general public, as to there being some connection, authorization, or relationship that exists between Minda's and the Dunkin' Marks, in violation of 15 U.S.C. § 1125(a).

74. Defendants' actions, as set forth above, are causing irreparable injury to Dunkin' through diversion of its goodwill to Minda's, and by diminishing and destroying Dunkin's goodwill and reputation, for which there is no adequate remedy at law.

75. Unless they are enjoined by this Court, Defendants will continue to cause a likelihood of confusion and deception to the general public and customers of Dunkin' franchisees and irreparable injury to Dunkin'.

76. This threat of future injury to Dunkin's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants continued use of the Dunkin' Marks and to ameliorate and mitigate Dunkin's injuries.

77. Upon information and belief, Defendants have derived unlawful gains and profits from their infringement of the Dunkin' Marks.

78. Dunkin' is also entitled to recover reasonable attorneys' fees and costs under 15 U.S.C. § 1117.

### Third Claim for Relief
### Breach of Contract

79. Dunkin' Franchising repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

80. The Franchise Agreements are valid and enforceable contracts between Dunkin' Franchising and Minda's.

81. Dunkin' Franchising has fully performed its obligations under the Franchise Agreements.

82. Pursuant to Section 14 of the Franchise Agreements, in the event of termination of the agreements, Minda's was required to comply with various post-termination obligations, including ceasing all operations of the Restaurants, no longer representing itself to the public as a Dunkin' franchisee, ceasing all use of the Dunkin' Marks and Dunkin's trade secrets, confidential information, manuals, and the Dunkin' System, returning all copies of the manuals, plans, specifications, and other proprietary materials relating to the operation of the Restaurants, and de-identifying them from the Dunkin' brand.

83. Pursuant to Section 10.2 of the Franchise Agreements, for the first 24 months after termination of the agreements, Minda's agreed it would not operate a business "that sells products that are the same as or substantially similar to those sold in Dunkin' Donuts restaurants and located within five (5) miles" from the Restaurants or "any other Dunkin' Donuts restaurant that is open or under development."

84. Minda's breached (and continues to breach) Sections 10.2 and 14.7 of the Franchise Agreements by (i) continuing to operate the Restaurants, selling the same products, and using the Dunkin' Marks and Dunkin's trade secrets, confidential information, manuals, and Dunkin' System, (ii) failing to return such materials to Dunkin', and (iii) failing to de-identify the Restaurants.

85. Unless enjoined, Minda's will continue to breach its post-termination obligations, including those identified herein, in violation of the Franchise Agreements.

86. By reason of Minda's ongoing and continuing misconduct, Dunkin' Franchising has suffered and, unless such misconduct is enjoined, will continue to suffer, irreparable harm, including lost profits and business opportunities as well as damage to the Dunkin' System and Dunkin' Franchising's good will and reputation.

87. Dunkin' Franchising has no adequate remedy at law because the harm it has suffered and will continue to suffer includes (in addition to lost profits and business opportunities), loss of goodwill and damage to reputation, which are difficult or impossible to quantify, such that damages alone cannot fully compensate Dunkin' Franchising for its loss.

88. Further, as a direct and proximate result of Minda's breaches of the Franchise Agreements, Dunkin' Franchising has been damaged in an amount to be proven at trial.

89. Dunkin' Franchising is also entitled to recover reasonable attorneys' fees and costs pursuant to Section 14.4.4 of the Franchise Agreements.

**Fourth Claim for Relief**
**Breach of Contract Under Personal Guarantees**

90. Dunkin' Franchising repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

91. Pursuant to the express terms and conditions of the Personal Guarantees, Daviduk is in breach of the Personal Guarantees by virtue of Minda's failures to complying with its post-termination obligations under the Franchise Agreements as detailed above.

92. Pursuant to the express terms and conditions of the Personal Guarantees, Daviduk is also obligated to pay Dunkin' Franchising's reasonable attorneys' fees and costs under Section 14.4.4 of the Franchise Agreements.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Dunkin' Donuts Franchising LLC and DD IP Holder LLC pray for relief against Defendants as follows:

A. Compensatory damages in an amount to be proven at trial;

B. A preliminary and permanent injunction enjoining Defendants and all those in active concert or participation with them from (1) continuing to operate the Restaurants; (2) operating any business offering the same or similar services as the Restaurants within 5 miles of the Restaurants for a period of two years (other than an authorized Dunkin' franchised restaurant); (3) holding themselves out as an authorized Dunkin' franchisee at the Restaurants; (4) using the Dunkin' Marks or Dunkin' Franchising's trade secrets, confidential information, manuals, or Dunkin' System at the Restaurants; and (5) retaining and not returning to Dunkin' all copies of the manuals, plans, specifications, and other materials relating to the Restaurants.

C. Treble damages as provided under 15 U.S.C. § 1117;

D. Disgorgement of all monies realized by Defendants' unauthorized use of the Dunkin' Marks, the trade dress, the Systems, or any form thereof;

E. For Dunkin' Franchising's attorneys' fees, costs, and expenses incurred as provided under the Franchise Agreements and 15 U.S.C. § 1117;

F. For prejudgment interest;

G. For interest on the foregoing amounts at the highest lawful rate from the entry of judgment until paid in full; and

H. An order granting such other and further relief as this Court deems just and proper.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | DUNKIN DONUTS FRANCHISING LLC and DD IP HOLDER LLC |
|  | By their attorneys, |
| Dated:  February 3, 2023 | /s/ Jonathan M. Shirley |

Jonathan M. Shirley (NH Bar No. 16494)
Cullen Collimore Shirley PLLC
37 Technology Way, Suite 3W2
Nashua, NH 03060
Tel.  603.881.5500
Fax:  603.881.5507
jshirley@cullencollimore.com

Bethany L. Appleby
(*pro hac vice application forthcoming*)
DLA PIPER LLP (US)
33 Arch Street
Boston, MA 02110-1447
Tel. 617.406.6048
Fax 617.406.6100
bethany.appleby@us.dlapiper.com

John F. Verhey
(*pro hac vice application forthcoming*)
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Tel: 312.368.4044
Fax: 312.251.2195
john.verhey@us.dlapiper.com

*Attorneys for Plaintiffs*